**I. F. LAUCKS, Inc., v. KASENO PRODUCTS CO. et al. (two cases).**

Nos. 621, 659.

District Court, W. D. Washington, N. D.

June 15, 1932.

G.. Wright Arnold and Raymond D. Ogden, both of Seattle, Wash., for plaintiff.

J. Y. C. Kellogg and Richard J. Cook, both of Seattle, Wash. (Battle, Hulbert & Helsell, of Seattle, Wash., of counsel), for defendants Kaseno Products Co. and George F. Linquist.

Allen & Walthew, of Seattle, Wash., for defendants Chas. H. Lilly Co. and Wilmot H. Lilly.

CUSHMAN, District Judge.

These suits are for the infringement of three patents for cold process glues. In this opinion these patents will be referred to as the Johnson patent, the caustic soda patent, and the carbon bisulphide patent, except where otherewise indicated.

The defendants Kaseno Products Company and George F. Linquist will be referred to as the defendants.

### Johnson Patent.

The first of the three patents, in time, is the reissue of the Johnson patent of July 3, 1923, reissue No. 16,422, original No. 1,460,-757. Claims 5 and 8 of this patent are not in suit. The claims in suit comprise both product and process claims. Claims 3 and 7 of this patent are as follows:

"3. An adhesive composition comprising the tacky substance of the soya bean, hydrated lime, and sodium fluoride."

"7. The process of making an adhesive composition which consists in extracting the oil from the soya bean, grinding the residue, and then adding to the finely ground residue, hydrated lime and sodium fluoride."

The defendant Linquist testified:

"A. Do you want the formula for the glue?

"Q. From August, 1927. I do not know what you call it.

"A. The glue that was turned out, it had soya meal, 65; tri-sodium phosphate, 6; sodium per borate, 1; sodium fluoride, 1; vegetable casein, 10, and lime, 18."

The foregoing shows infringement by the defendants, if this patent is valid. Tilghman v. Proctor et al., 102 U. S. 707, 731, 26 L. Ed. 279; Hoskins Mfg. Co. v. General Electric Co. (D. C.) 212 F. 422, 428; Schram Glass Mfg. Co. v. Homer Brooke Glass Co. (C. C. A.) 263 F. 903.

Claim 3, it has been contended, is void because the invention of the reissue patent is not the invention taught or disclosed in the original Johnson patent; that the invention disclosed in the original Johnson patent was that the soya bean contains an adhesive constituent which Johnson designated a "tacky substance"; that the file wrapper of the original patent limited the definition of "tacky substance" to nitrogenous matter; that the nitrogenous matter in the soya bean is protein; that there is no disclosure or teaching whatever in the original patent that the tacky substance is soya bean flour.

The plaintiff, after the commencement of these suits, disclaimed chemically isolated protein. No other practical method of isolation has been shown. In the specifications of the original patent it is stated:

"I have discovered from experiments that a high class waterproof adhesive, such as so-called glue, may be realized from soya beans, or rather the residue derived from soya beans after the oily content of the beans has been extracted. This residue, I have found, contains a highly valuable adhesive constituent which provides an excellant base for an adhesive formula. One feature of the same resides in the fact that *I can use either the residue as a whole*, or else to realize a high grade product, I can extract by any suitable means the adhesive constituent of the residue.

"In carrying out the invention, soya beans are first pressed, or otherwise treated, to extract their oily content and the resultant pressed cake is either finely ground, *when the whole of the residue is to be used*, or else it is treated to extract the adhesive constituent when the high grade adhesive is to be produced. This adhesive constituent, *or even the finely ground pressed* cake, may be considered as a base for my formula and the same, on account of its adhesive qualities, I will term a tacky substance." (Italics the court's.)

In view of this disclosure, it is clear the defendants' contention in this particular is not tenable.

Defendants further contend that there was no invention in substituting the protein of the soya bean in place of casein as an adhesive base; that the protein of soya bean, frequently referred to in the prior art as "vegetable casein," is practically identical with the protein of milk, or casein and its equivalent.

Upon this question, even unaided by the presumption in favor of the validity of the patent, the decided preponderance of the evi-

dence is in plaintiff's favor. The evidence shows that with soya bean meal or flour as a glue base there is not the same uncertainty, lack of uniformity, or variation in the result as there is with casein. The prior art taught the necessity of the isolation of the adhesive base. Johnson taught this was not necessary and that what had been considered largely a waste material might be used as a valuable glue base. Further reasons why this contention of the defendants is untenable it is not necessary to state.

The defendants further contend that the patent is void because of insufficiency of disclosure.

The patent specifications provide:

"I have discovered from experiments that *a high class waterproof adhesive*, such as so-called glue, may be realized from soya beans, or rather the residue derived from soya beans preferably after the oily content of the beans has been extracted. This residue, I have found, *contains a highly valuable adhesive constituent* which provides an excellent base for an adhesive formula. One feature of the same resides in the fact that I can use either the residue as a whole, or else to realize a high grade product, I can extract by any suitable means *the adhesive constituent of the residue.*

"In carrying out the invention, soya beans are first pressed, or otherwise treated, to extract their oily content and the resultant pressed cake is either finely ground, when the whole of the residue is to be used, or else it is treated to extract the adhesive constituent when the *high grade adhesive* is to be produced." (Italics the court's.)

Defendants contend that, if the patent is to be held valid, the specifications must fully and completely describe the method of making "this high class waterproof adhesive," and, as it does not teach the method of extracting "the adhesive constituent," that the patent is invalid. The plaintiff, having disclaimed chemically isolated protein, and now suing on the claims, for the finely ground soya bean cake, after oil extraction, as the adhesive base, this contention is without merit.

Defendants further contend that the patent is void because the claims are too broad, indefinite, abstract, ambiguous, and vague; that it is not shown what is meant by "tacky substance" of the soya bean; and because no proportions are stated.

In the specifications it is stated:

"In carrying out the invention, soya beans are first pressed, or otherwise treated, to extract their oily content and the resultant pressed cake is either finely ground, when the whole of the residue is to be used, or else it is treated to extract the adhesive constituent when the high grade adhesive is to be produced. This adhesive constituent, or even the finely ground pressed cake, may be considered as a base for my formula and the same, on account of its adhesive qualities, I will term a tacky substance * * * the tacky substance and the two agents named being mixed in solution. I, of course, do not confine myself to hydrated lime and sodium fluoride, as any other agents having substantially the same characteristic qualities will be sufficient. In fact, entirely different agents may be used, but I have not as yet experimented further than the agents of this character. The hydrated lime is, of course, a waterproofing solvent, and the sodium fluoride is a so-called liquefying agent; in other words, it prevents the compound from drying out. I have found that the following proportions give satisfactory results: About two and one-half to three parts hydrated lime, one part sodium fluoride, about ten parts of the tacky substance, and sufficient water to make up a solution of the desired consistency.

"The term adhesive, or glue, should not be construed in either the specification or claims as limited to the ordinary accepted meaning of the term, as this tacky substance may be used to advantage in calcimine formulas and other instances where a strong adhesive is not necessarily required. * * *

"Soya beans, or rather the residue, may be obtained at a very nominal cost and the treatment necessary to either grind the residue when it is used as a whole, or when it is treated to extract the adhesive constituent, is very simple. Consequently the base for the formula is realized without expensive equipment or other high cost."

The foregoing disclosures, in the particulars questioned, are sufficient to teach those familiar with the glue art.

Defendants further contend that the patent is void because of lack of invention, in view of the known state of the art, and that it was directly anticipated by certain patents and publications. In this opinion throughout only those patents and publications stressed in defendants' brief as anticipations of the patents in suit will be considered. Among the patents claimed to anticipate the Johnson patent are:

United States patents No. 1,245,975 to

Satow, No. 1,143,893 to Dodd and Humphries, No. 883,995 and No. 932,527, both issued to Wiechmann. These four patents are for plastics rather than for adhesives. While the plastic art is not one entirely unrelated to the glue art, it is not so nearly related as to be an analogous art whose teachings are to be considered a part of the adhesive art.

In the adhesive art—particularly in that part of the art having to do with veneering and the ply wood industry, which is here involved—while the property of cohesion in the dried glue line itself is important, in that it gives strength thereto, of no less importance is the property of adhesion by virtue of which the glue of the glue line fastens itself to each of the two surfaces between which the glue line is placed. In a plastic, while the property of adhesion may be of value where a foreign substance is carried by the plastic, as in the case of wood carpet, it is not of the same relative importance as in the glue art. These patents do not anticipate the Johnson patent.

The Johnson patent, it is further contended, was anticipated by Japanese patents No. 33,092 to Satow and No. 33,018 to Kishi and Tanaka. In important particulars there is a dispute between the parties as to the translation of these patents. In view of the difference in the translations and the supporting evidence, it cannot be said that the defendants have maintained the burden of showing that either of these patents anticipate that in suit.

The patent in suit is claimed to be anticipated by Japanese patent to Ishii, No. 31,331, United States patent No. 1,064,841 to Yu Ling Li, United States patent No. 1,437,487 to Biddle, and British patent No. 30,275 to Yu Ling Li. None of these four patents are glue patents. The patent to Ishii is for a putty in which soya bean meal is mixed with oil. The patents to Yu Ling Li are for the use of soya beans in the manufacture of foods. The patent to Biddle is for a composition of matter or a compound of the nature of rubber, gutta-percha, or balata. Neither of these four patents anticipate the patent in suit.

The following patents it is also claimed anticipate the patent in suit: United States patents No. 845,790 to Isaacs, No. 1,373,412 to Craver, and No. 725,816 to Bartels, Swiss patent No. 90,301 to Knorr, and British patents No. 140,911 to O'Gorman and No. 148,216 to Knorr.

In the patent to O'Gorman, the claimed base is an isolated protein.

In the British patent to Knorr, the glue base is described as "a protein compound capable of forming salts." The specifications state:

"The new glue is a mixture of a protein substance capable of forming salts. * * *

"Example 2.

" * * * The casein can also be used in the form of cheese or curds of milk. Other protein substances forming salts may be used e. q. blood-albumen, glutin, albumoses etc., in quantities giving substantially the protein equivalent of the casein used in Example 1. * * * "

The substances enumerated, casein, bloodalbumen, and glutin, are all of animal origin, and were familiar in the glue art. If it be assumed that the words of the claim, "a protein compound capable of forming salts," or the words of the specification, "protein substance capable of forming salts," are descriptive of soya bean flour or meal, yet to hold that the patent in suit was anticipated by Knorr would be to give Knorr something which he had in general terms described in his specifications but which he had not discovered. This the court may not do. The Incandescent Lamp Patent, 159 U. S. 465, 472, 16 S. Ct. 75, 40 L. Ed. 221; Corona Co. v. Dovan Corp., 276 U. S. 358, 385, 48 S. Ct. 380, 72 L. Ed. 610; Holland Furniture Co. v. Perkins Glue Co., 277 U. S. 245, 257, 48 S. Ct. 474, 72 L. Ed. 868.

The Knorr Swiss patent is not materially different in this respect from the British patent.

In the United States patent to Bartels, No. 725,816, while linseed meal was claimed in the patent as a part of the glue base, much the greater part was described in the specifications as ordinary animal glue. This patent is for a hot process glue.

In the United States patent to Craver, No. 1,373,412, as in the case of the patent to Knorr, the claim and specifications are too indefinite in the particular to which they are cited.

United States patent to Isaacs, No. 845,790, teaches, in so far as the question involved in this case is concerned, the use as a glue base of protein; that is, isolated protein. The specifications state:

"By my method, I treat the proteid with lime and compounds of hydrofluoric acid,

combining the compound of hydrofluoric acid, such as alkaline fluorids, with the proteid. * * *

"An additional advantage due to my invention is that any ordinary animal and vegetable proteid—such as hide, glue, casein, starch, resin, gums, etc., which are commonly used for glues or sizings—are enriched and made moisture-proof by the use of the ingredients above set forth. The glues or sizings thus made are additionally fast with or without colors, and their quality of being water-proof when dry is also increased."

None of the foregoing six patents anticipates the patent in suit.

It has been further contended that the Johnson patent was anticipated by the publications of Dr. Satow, including one entitled "Research on Oil and Proteids Extraction from Soy-Bean," reprinted from the Technology Reports of the Tohoku Imperial University, vol. II, No. 2, October, 1921, and another entitled "Manufacture of Plastic Products from Proteid of Soy Bean," reprinted from the Technology Reports of the Tohuku Imperial University, vol. III, No. 4, June, 1923. In so far as these publications describe an adhesive, such description is limited to the protein of the soya bean. They do not anticipate the patent in suit. Claims 3 and 7 of this patent are held to be valid and infringed.

Claims 1, 2, 4, and 6 are as follows:

"1. An adhesive composition comprising the tacky substance of the soya bean, and an alkali-metal liquefying agent."

"2. An adhesive composition comprising the tacky substance of the soya bean, and an alkali-metal liquefying agent, and a waterproofing agent."

"4. The method of making an adhesive composition which consists in including therein the tacky substance of the soya bean."

"6. The process of making an adhesive composition which consists in extracting the oil from the soya bean, and adding to the residue an alkali-metal liquefying agent and a waterproofing agent."

The court will not undertake to determine the validity or scope of claims 1, 2, 4, and 6. The issues as to them, while possibly not moot, are so nearly so as to involve in their consideration somewhat the same danger as though they were. Where it is contended that a specific claim has been infringed, there is on the part of neither party to the litigation the same incentive to fully develop the subject of a general claim as there would be were not the specific claim alleged to be infringed.

As before stated, claims 5 and 8 are not in suit.

### Caustic Soda Patent.

United States patent No. 1,689,732 to Laucks and Davidson is also in suit. The application for this patent was made by assignors of plaintiff in October, 1923, and the patent was granted in October, 1928. There are eight product claims and two process claims. Claims 9 and 10 are not in suit.

Of the ten claims in this patent, the odd numbered either describe the glue base as "a vegetable seed flour of considerable protein content," "vegetable protein flour," or "vegetable flour matter having a considerable protein content." In the even-numbered claims the glue base is described as "the reaction products of soya bean flour." The claimed infringement in the particular of the glue base rests upon the use by defendants of soya bean flour. The court will not undertake to determine the validity or scope of any of the odd-numbered claims for the same reason as that stated concerning claims 1, 2, 4, and 6 of the Johnson patent. The broadest of the remaining product claims is claim 2, which is as follows:

"2. A vegetable glue composition, comprising the reaction products of soya bean flour and an alkali-metal hydroxide as such in an aqueous medium."

Claim 8, a process claim, is as follows:

"8. The process of making a vegetable glue, which comprises treating soya bean flour with caustic soda as such in an aqueous medium, the proportions of such flour and the caustic soda being about 30 parts of the flour and about 2-4½ parts of caustic soda in aqueous solution."

It has been stipulated:

"It is further stipulated that the defendant Kaseno Products Co. is engaged in the manufacture of adhesive or glue and that it has used and is now using in the manufacture of its adhesives or glue, among other things, the folowing ingredients:

"1. Soya bean flour purchased from the defendant Chas. H. Lilly Co.

"2. Hydrated lime.

"3. Trisodium phosphate.

"4. Caustic soda as purchased in the market.

"5. That up to about February 20, 1929, carbon bisulphide was used."

The defendant Linquist testified:

"Q. At the present time how many soya bean glues is the Kaseno Products Company putting out? A. We are making two, commercially.

"Q. Do you have a special name for these glues? A. Yes; one is No. 26 Glue, and one is No. 3355.

"Q. I will ask you whether or not your No. 26 glue is made up. of a mixture of the following ingredients: water, soya bean meal, blood, copper sulphate, caustic soda, hydrated lime, silicate of soda, and viscose? A. It is.

"Q. I will ask you whether or not your glue number 3355 is made up of the following ingredients: water, soya bean meal, caustic soda, hydrated lime, silicate of soda, viscose and hexamethylenetetramin? A. It is.

"Q. Is there hexamethylenetetramin in your No. 26 glue? I omitted that. A. Yes."

The stipulation and the testimony of the defendant Linquist show infringement of claims 2, 4, 6, and 8 of this patent, if valid. Defendants do not seek to avoid infringement because of a restricted range in the percentage, proportion or relative amounts of the ingredients making up the glue. It is not therefore necessary to consider such question. Fullerton W. G. Ass'n v. Anderson-Barngrover Mfg. Co. (C. C. A.) 166 F. 443.

It has been contended that the state of the art was such that the use of caustic soda only required the exercise of ordinary skill by those familiar with such art. At the time in question the only glue base of a vegetable substance with which caustic soda was used was starch. Such prior use, coupled with the fact that it may also have been used in the making of glues other than those of vegetable origin, is not sufficient to overcome the presumption in favor of the validity of the patent.

It has been further contended that the patent was anticipated by earlier patents and publications.

The following patents claimed to anticipate the caustic soda patent have already been considered in connection with the Johnson patent and will not be again considered: United States patent No. 1,245,975 to Satow, Japanese patent No. 33,092 to Satow, Japanese patent No. 31,331 to Ishii, and United States patent No. 1,373,412 to Craver.

In addition to the foregoing, it is contended that anticipation is shown by the British patent No. 186,157 to Schryver, the provisional application for such patent, and the Johnson reissue patent, the same being the patent in suit already considered.

Defendants did not give notice of the Schryver patent or of the provisional application as required by section 4920, Revised Statutes (title 35, USCA § 69). Teese et al. v. Huntingdon et al., 64 U. S. (23 How.) 2, 16 L. Ed. 479; Simplex Window Co. v. Hauser Reversible Window Co. (C. C. A.) 248 F. 919, 920; Morton v. Llewellyn (C. C. A.) 164 F. 693, 694. The trial of these cases was begun in April, 1930, and was not concluded until June, 1931. If, because of the length of time from the beginning until the close of the trial, or for other reasons, the present causes are taken out of the rule of the above statute and cases, it is clear that the Schryver patent is for a plastic and, for the reasons already stated in considering the Johnson patent, does not anticipate the patent in suit. Reaching this conclusion it is not necessary to consider the effect to be given a provisional application for a British patent which, in the case of the Schryver patent alone, antedates the application for the patent in suit by more than two years.

As already stated, it is also claimed that the caustic soda patent is anticipated by the first patent in suit, the Johnson patent. This contention rests upon the following three grounds: First, that claim 8 of the Johnson reissue, which claim as before stated is not in suit, teaches the use of caustic soda with soya bean. This claim is as follows:

"8. In a method of making glue, the steps which consist in treating protein-containing vegetable material derived from the soya bean with an alkali metal compound, and lime."

The words of the claim, "an alkali metal compound," it is contended include caustic soda. One of the defendants' principal witnesses, a chemist of note, testified:

"Q. Do or do not the words 'caustic alkali,' as used by you and other chemists, include both alkali metals and alkali earth metals? A. Usually we understand it to include caustic soda, caustic potash, caustic ammonium, and caustic lime.

"Q. Caustic soda being an alkali metal, and lime being an alkali earth metal? A. Yes, sir."

The words of the claim, "alkali metal compound," are descriptive of caustic soda, an alkali metal hydroxide. But claim 8 of the Johnson reissue patent is a claim not found in the original. The application for the reissue was filed after the application

for the caustic soda patent. Claim 8 of the reissue is invalid, as it includes new matter, caustic soda, which was not described in the application for the original Johnson patent. The reasons for so holding will be stated in the discussion of the defendants' next point. Therefore claim 8, in so far as its effect is concerned as anticipating the caustic soda patent, would not relate back to the time of the original Johnson application. Revised Statutes, § 4916 (title 35, USCA § 64, and cases cited under note 53).

Defendants next contend that Johnson taught the use of caustic soda by the following in the specifications of his patents:

"I compound the tacky substance with various other agents which may be those commonly used in the manufacture of adhesives, such as hydrated lime and sodium fluoride, the tacky substance and the two agents named being mixed in solution. I of course do not confine myself to hydrated lime and sodium fluoride, as any other agents having substantially the same characteristic qualities will be sufficient. In fact, entirely different agents may be used, but I have not as yet experimented further than the agents of this character."

Without question caustic soda had been used in the making of starch glues. The court does not find it necessary to determine whether the evidence shows that it had "commonly" been used in the manufacture of adhesives, for the quoted description, "any other agents having substantially the same characteristic qualities," is too general and indefinite to be a teaching of caustic soda. The Incandescent Lamp Patent, 159 U. S. 465, 16 S. Ct. 75, 40 L. Ed. 221.

It is further contended that, as the lime and sodium fluoride of the Johnson patent, by double decomposition, form caustic soda, the Johnson patent anticipated the patent in suit. One of the defendants' witnesses, a chemist experienced in the glue of the ply wood industry, testified:

"Q. (By Mr. Kellogg) Shortly before the recess there was some testimony on your part, I believe, as to hydrated lime and sodium fluoride together creating or making sodium hydroxide? A. Yes, sir.

"Q. Caustic soda? A. Yes, sir.

"Q. Will that reaction take place in the presence of colloids? A. Yes, sir. * * *

"A. When treated with caustic soda the reaction is faster and more thorough in the same length of time than with lime and so-dium salts, due to the fact that you must in one case have two reactions taking place, one, a decomposition, or double decomposition between your lime and your sodium salts, producing caustic soda, and then this caustic soda reacting with the vegetable protein-containing material, and in the other case you have your caustic soda added directly, and, therefore, there is less time taken. Otherwise, the action is essentially the same."

Aside from the presumption of validity of the patent in suit and from the presumption arising from the fact that the caustic soda glues drove out the double decomposition glues of Johnson, the foregoing shows that Johnson did not anticipate the patent in suit in this respect.

The two publications of Dr. Satow, claimed by defendants to anticipate the Johnson patent, they also contend anticipate the caustic soda patent and further contend that certain other published articles by Dr. Satow anticipate the caustic soda patent. In the particular in question these articles disclose nothing further than the use of protein, and do not anticipate the caustic soda patent.

Claims 2, 4, 6, and 8 are held to be valid and to have been infringed.

### Carbon Bisulphide Patent.

Latest, in time, of the patents in suit is United States patent No. 1,691,661. There are forty claims in this patent. The only ones that claim specifically a glue base of soya bean flour are claims 13 and 14. In the other claims the glue base is described as "vegetable protein matter," "soya bean protein matter," "vegetable protein-containing adhesive," or "soya bean protein-containing adhesive." For the same reasons a ruling was not made concerning the validity and scope of claims 1, 2, 4, and 6 of the Johnson patent, a determination of the validity of claims other than 13 and 14 will not herein be attempted.

Claims 13 and 14 of this patent are as follows:

"13. An adhesive which comprises the reaction products of soya bean flour, an aqueous alkaline medium, and carbon bisulphide as a water-proofing agent."

"14. An adhesive which comprises the reaction products of soya bean flour, an aqueous alkaline medium, and carbon bisulphide, the carbon bisulphide and the soya bean flour being in the proportions of about five parts and about thirty parts respectively."

The ingredients used in the defendants' glues will be restated. As described in the stipulation they are:

"1. Soya bean flour purchased from the defendant Chas. H. Lilly Co.

"2. Hydrated lime.

"3. Trisodium phosphate.

"4. Caustic soda as purchased in the market.

"5. That up to about February 20, 1929, carbon bisulphide was used."

The defendant Linquist testified:

"Q. At the present time how many soya bean glues is the Kaseno Products Company putting out? A. We are making two, commercially.

"Q. Do you have a special name for those glues? A. Yes; one is No. 26 Glue, and one is No. 3355.

"Q. I will ask you whether or not your No. 26 glue is made up of a mixture of the following ingredients: water, soya bean meal, blood, copper sulphate, caustic soda, hydrated lime, silicate of soda, and viscose? A. It is.

"Q. I will ask you whether or not your glue No. 3355 is made up of the following ingredients: water, soya bean meal, caustic soda, hydrated lime, silicate of soda, viscose and hexamethylenetetramin? A. It is.

"Q. Is there hexamethylenetetramin in your No. 26 glue? I omitted that. A. Yes."

By the foregoing, infringement is shown prior to 1929 if claims 13 and 14 are valid. Separate consideration is necessary after that date on account of the defendants' use of viscose and not of carbon bisulphide.

Injunctive relief should not be denied merely because a defendant no longer infringes. Du Bois v. Kirk, 158 U. S. 58–65, 66, 15 S. Ct. 729, 39 L. Ed. 895; Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U. S. 405, 28 S. Ct. 748, 52 L. Ed. 1122, affirming (C. C. A.) 150 F. 741; W. A. Schleit Mfg. Co. v. Syracuse Radiator Co. (C. C. A.) 288 F. 52, affirming (D. C.) 278 F. 305, 307; Western Electric Co. v. Capital Telephone & Telegraph Co. et al. (C. C.) 86 F. 769–778; Star Ball Player Co. v. Baseball Display Co. (D. C.) 8 F.(2d) 46–49.

The evidence clearly shows that the addition of carbon bisulphide increases the water resistance of the glues in question. The defendants' first contention, that this patent is invalid, is well stated in the words of their brief:

"The Carbon Bisulphide Patent is Invalid for Lack of Invention.

"It is the defendants' contention that by adding carbon bisulphide to soya bean glue which has been treated with caustic soda, the fibrous matter or cellulosic material in the flour is converted into viscose, and that it is this viscose reaction which gives the resultant glue greater water resistance. The making of viscose by treating cellulosic material with caustic soda, and carbon bisulphide was well-known long prior to the time the Carbon Bisulphide Patent was applied for. The defendants contend that there was no invention in converting the fibrous matter contained in soya bean flour into viscose by this well-known method, and thereby making the glue more waterproof.

"Plaintiff contends that the function of carbon bisulphide is not to make viscose in the glue mix but is to make the glue more water resistant by acting upon the protein.

"We will take up first our contention that the action of carbon bisulphide is a viscose reaction, and second, that this viscose reaction was well-known.

"(a) Carbon Bisulphide Does Not Waterproof Protein But Acts on the Fibrous Matter, Converting the Same Into Viscose.

"Plaintiff was compelled to adopt the theory that carbon bisulphide acts upon the protein. Such was the representation made to the Patent Examiner in order to secure a patent. Because of the prior art, containing patents on adhesive compositions made by treating starch and carbohydrates, including cellulose, with carbon bisulphide, the applicants, in order to obtain any patent at all, were driven to take the position that they were attacking protein. That they unqualifiedly took this position is shown by reference to the Carbon Bisulphide file wrapper, Defendants' exhibit 'A–23.'"

Plaintiff admits that the viscose reaction was old, admits that the representation to the Patent Office was that the increased water resistance of plaintiff's carbon bisulphide glue was due to the chemical action on the vegetable protein matter of the soya bean flour, but denies the viscose reaction in the glue of its patent. The decided preponderance of the evidence is that there is no viscose reaction in plaintiff's carbon bisulphide glue. The most conclusive proof of this probably is that the amount of caustic soda used in the glue of the patent is many times less than the amount necessary for the viscose reaction. There is no preponderance

of the evidence that the water resistance of this glue is increased because of any effect of the caustic soda upon the hemi-celluloses as claimed by the defendants rather than upon the protein as taught by the carbon bisulphide patent. Even though it be assumed that a much lower concentration of caustic soda is necessary to dissolve hemi-celluloses than cellulose, yet there is no preponderance of the evidence that viscose can be made from hemi-cellulose.

In addition to the United States patent No. 1,245,975 to Satow already considered, and held to teach a plastic, the defendants contend that the carbon bisulphide patent was anticipated by the following patents: United States patent No. 1,078,692 to Perkins, United States patent No. 1,412,020 to Stern, and three patents to Chavassieu, one British No. 26,155, and two United States patents numbered 984,539 and 950,435, respectively.

The Perkins patent teaches a glue base neither of soya bean flour nor of any vegetable seed flour of considerable protein content, but of starch or carbohydrates, as is clearly shown by the following from the specifications of that patent:

"The present invention in one form may be said to consist in suitably modifying the last step or operation of the processes described in said patents by prolonging the same with or without an increase in temperature whereby the caustic soda alone acts as a substitute for the caustic soda and peroxid of soda, or as a substitute for the acid or other suitable *starch* degenerating agents, to produce in the glue-dissolving kettle itself, a series of reactions by which the viscosity, cohesiveness and adhesiveness of the *carbohydrates*, when finally dissolved shall be more or less affected simultaneously with, or in substantially the same operation as, the treatment which puts the *carbohydrate* into solution.

"The success of this treatment depends to a considerable extent on the character of the *carbohydrates* used. Various *starches and flours* may be used but in each case the treatment should be slightly modified in order to adjust it to the particular characteristics of the raw material used. Even the same kinds of *starch* manufactured from plants of a different growth or found in a different locality, or even *starches* from the same plant separated by slightly different processes of manufacture, are found to differ sufficiently to require modification in the treatment. The *starches or flours obtained from corn, wheat,* *potato, sago palm and the cassava* plants have all been tried with success but for most purposes the most convenient and economical *starches* have proven to be those derived from the cassava plant and sold on the market as *cassava flour* of the grades M-4, M-5 or "Royal." Examples of the process as carried out with *starches* known as cassava M-4 and cassava M-5 and Royal, will first be given and then a more general specification will be given, by which anyone skilled in the art may apply the process to *other flours and starches* and produce usable results, and by slight adjustment of this general treatment it may be readily modified to adapt itself more particularly to the *starch* in question, and produce increasingly satisfactory results, as will be understood by those skilled in the art. * * *

"It will be obvious in all these examples, that the treatment has been such as to permit a portion of the caustic soda used, to act either alone or together with heat, upon the undissolved *starch* granule, for a period depending on the strength of the caustic and the temperature used. * * *

"It is therefore clear that the invention in its broader aspects is not limited to the particular *carbohydrates,* temperatures or percentages stated, nor to the use of caustic soda alone, as other *carbohydrates* such as certain grades of *celluloses or hemi-celluloses,* and other temperatures and percentages, and other caustics such as caustic potash and other solvents of cellulose, such as for instance sodium xanthate, sodium silicate, zinc chlorid and basic lead acetate, will readily suggest themselves to those skilled in the art to meet the peculiar exigencies of each case." (Italics the court's.)

The patent to Stern, United States patent No. 1,412,020, is also for a glue with a starch base.

None of the patents to Chavassieu, the British patent No. 26,155 nor either of the two United States patents numbered 950,-435 and 984,539, the latter relating to improvements in the processes of his earlier United States patent, is for a glue. In the specifications of the earlier of the United States patents, it is stated:

"The proteo-cellulosic-zanthate solutions can be applied to different industrial uses such as the manufacture of thread, silk, hair filaments, pellicles, molded and compressed tissues, etc, For instance. silky threads or filaments can be obtained by passing the substance through a draw plate and coagulat-

ing and treating the threads obtained with dilute sulfuric acid."

None of the five foregoing patents anticipate the patent in suit.

The defendants have further contended that they have in no event infringed this patent since 1929, having in that year stopped the use of carbon bisulphide and begun the use of viscose in the making of their glues. Defendants, in their brief, state the issue in this particular as follows:

"Since claims 13 and 14, which cover flour, are limited to carbon bisulphide, it follows that neither of these claims is infringed by the glues the defendant corporation is making, inasmuch as carbon bisulphide is not an ingredient of said glues. If the use of soya bean flour and viscose does infringe the Carbon Bisulphide patent, then that patent is invalid since the use of soya bean flour and viscose is taught by the Satow patent."

Viscose, as described by Ingo W. D. Hackh, in his Chemical Dictionary published by P. Blakiston's Son & Co., Inc., at page 766, is:

"An extremely viscous or glutinous, syrup-like liquid obtained by treating cellulose with potassium hydroxide and carbon disulphide, from which acids precipitate cellulose. By pressing this liquid through fine openings into dilute acids the cellulose separates into fine, silky threads—viscose silk, rayon."

From the evidence in this case it also appears that viscose is made by the use of caustic soda instead of potassium hydroxide. There is no difference between carbon bisulphide and carbon disulfide.

The specifications of the carbon bisulphide patent state:

"In order to improve the working properties, e. g. the spreading and flow, of the glue produced as aforesaid as well as the water resisting properties, we have found it desirable to add other substances of which the following are examples:—.

"Carbon bisulphide, calcium polysulphide. Equivalents would be other sulphur compounds of like properties or constitution, such as, for example, sodium thiocarbonate and potassium xanthate, sodium silicate, or other soluble silicates."

Viscose is, within this teaching, a sulphur compound. The evidence in the case, including the conduct of defendants in substituting viscose for carbon bisulphide, shows that for the uses in question viscose is a sulphur compound with properties like those of carbon bisulphide. It is not necessary to determine whether "cellulose esters," as the expression is used in the patent to Satow, includes viscose or not, for Satow's patent teaches the making of a plastic and not a glue.

■ Claims 13 and 14 are valid and have been infringed. Infringement of the three patents in suit is not avoided by adding to the described materials of the patents other substances not shown to radically change the composition of the patent. Tilghman v. Proctor et al., 102 U. S. 707, 731, 26 L. Ed. 279; Hoskins Mfg. Co. v. General Electric Co. (D. C.) 212 F. 422, 428; Schram Glass Mfg. Co. v. Homer Brooke Glass Co. (C. C. A.) 263 F. 903.

### Contributory Infringement.

■ The defendants Chas. H. Lilly Company and Wilmot H. Lilly are sued for contributory infringement. It is alleged that these defendants sold to the Kaseno Products Company soya bean material adapted and intended to be employed as a substantial part of the infringing adhesive of the defendant Kaseno Products Company, knowing that said material was to be used in the manufacture of the infringing adhesive; that the defendant Wilmot H. Lilly is the president of the Chas. H. Lilly Company and directs and controls all of its acts and is directly and personally in charge of conducting the infringing acts of said company of which complaint is made. The evidence has established that the defendant Wilmot H. Lilly, as alleged, directs and controls the acts of his company.

It has been stipulated that these two defendants on and before the bringing of the present suits "sold and delivered and is now selling and delivering to the Kaseno Products Co., a co-defendant herein, soya bean seed cake ground to glue specifications, that is eighty mesh or finer, for use in the manufacture of the adhesives or glues of said company."

Two letters of the defendant Chas. H. Lilly Company were introduced in evidence. These letters are as follows:

"October 17, 1928.
"The Arabol Manufacturing Co., 110 East 42nd St., New York, N. Y.

"Gentlemen: We are manufacturers of Soya Bean Flour which is being used extensively on this Coast as a base in waterproof glue. Glue made from this material has almost entirely replaced casein glue in

the manufacture of Ply wood or veneer. Formerly the mills in this territory used practically nothing but casein glue in the manufacture of these panels but have now switched to a Soya Bean glue with which they secure as good or better adhesive at a far lower cost.

"We understand you people are the largest manufacturers in the world of various adhesives and the thought occurred to us that if you are not now using Soya Bean flour in any of your products you might be interested in doing a little experimenting along this line. If you are already using this material we would be only too glad to submit samples of our product and quote you prices.

"Our material is a true Soya Bean flour in every sense of the word and is not to be confused with various grades of fine ground Soya Bean meal which are sometimes offered. Our material is specially processed to remove a very large percentage of the fiber and is bolted through a flour mill process through a fineness of 100, 109, or 126 mesh. We have sold large quantities to glue manufacturers on the coast here and have shipped some to the glue manufacturers in the furniture district around Grand Rapids, Michigan, and also to various glue manufacturers on the East Coast, and in every case our product has met with their approval as to quality and uniformity, and we know that our prices are in line, and have been getting repeat business from them. We believe that if you are not now using Soya Bean Flour in any of your products it would certainly be to your interest to investigate its use, and to that end we are glad to furnish you with what samples and information we have on the subject.

"Awaiting your reply and trusting that we may be of some service to you, we are

"Yours very truly,

"Lilly's—Seattle.
"SEV—PE          By S. E. Victor."

"Nov. 1, 1928.
"The Arabol Manufacturing Co., 110 East 42nd St., New York, N. Y.

"Via.: Air Mail.

"Gentlemen: Attention, Mr. A. M. Baumann: We thank you for your letter of Oct. 23d and are glad to know that you are interested in Soya Bean Flour. We are sending you a 25 lb. bag of this material as a sample. We are sending you only the one grade which has been processed through 100 mesh. This is the grade that is in the greatest demand in this section of the country, although we have made some flour as fine as 109 and 126 mesh.

The various Glue manufacturers seem to prefer the finer mesh, however they have been buying the 100 mesh inasmuch as the cost is less.

"We are pleased to quote you a price of $65.00 per ton, F. o. b. Seattle, draft terms, in car lots, on this grade; or $70.00 per ton F. o. b. Seattle, draft terms, in less than car lots.

"This is a comparatively new commodity on the market and considering the short length of time it has been used it has gained the approval of Glue manufacturers in this locality. We have been told indirectly that Laucks & Company of Seattle handle hundreds of tons of this material each month, and it is said that they are using it both for Glue and for a wall texture. Several other manufacturers on this Coast and on the East Coast are buying the material in carload lots, and one of these manufacturers who turns out nothing but glue is now using four to five cars monthly. We see great possibilities for the use of Soya Bean Flour in your territory and are pleased that you are taking an interest in it and will undoubtedly do some experimenting. We shall be pleased to hear from you as to what you think of the material and how your experiments work out.

"Thanking you for the opportunity of quoting and submitting samples, and trusting that we may be of further service to you, we are

"Yours very truly,
"The Chas. H. Lilly Co.
"SEV—PE          By S. E. Victor."

The foregoing is sufficient to show contributory infringement on the part of these defendants and to take the case out of the rule that one who sells to an infringer an article of commerce having ordinary uses unconnected with the product of the patent, without intent to contribute to the manufacture of such product, does not infringe. The stipulation and letters show that it was the intent of these defendants that the article sold by them should be used in the manufacture by their codefendants of the product of plaintiff's inventions. Thomson-Houston Electric Co. v. Ohio Brass Co. (C. C. A.) 80 F. 712, 721–723; Electro Bleaching Gas Co. v. Paradon Engineering Co. (C. C. A.) 12 F.(2d) 511, 513; Trico Products Corporation v. Apco-Mossberg Corporation (C. C. A.) 45 F.(2d) 594, 599; Walker on Patents (5th Ed.) § 407. These defendants have also infringed the claims of the three patents which have been held valid and infringed by the other defendants.

The decree will be as herein indicated, the findings, conclusions, and decree to be settled upon notice and the parties to be heard upon the question of costs at the time of settling the decree. Revised Statutes, § 4922 (title 35, USCA § 71). The clerk is directed to notify the attorneys for the parties of this decision.